**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| GENERAL MARINE II, LLC, a Delaware limited liability company,<br><br>                                    Plaintiff,<br>v.<br>MICHAEL KELLY, an individual<br><br>                                    Defendant. | Case No.:  3:21-cv-1425-W-DEB<br><br>**ORDER GRANTING MOTION TO CONFIRM FOREIGN ARBITRATION AWARD [DOC. 7.]** |

  Pending before the Court is Plaintiff General Marine's Motion to Confirm the Foreign Arbitration Award under 9 U.S.C. § 201, *et seq*.  (*Mot.* [Doc. 7.])  Defendant Michael Kelly opposes.  (*Opp'n* [Doc. 8].)

  The Court decides the matter on the papers submitted and without oral argument.  Civ. L.R. 7.1(d)(1).  For the reasons that follow, the Court **GRANTS** Plaintiff's motion [Doc. 7] and **CONFIRMS** the arbitration award.

## I. BACKGROUND

On February 7, 2020, Defendant Michael Kelly entered into an agreement with Plaintiff General Marine to charter the luxury yacht *M/V ALESSANDRA* in the Bahamas from March 27 through April 4, 2020. (*Compl.* [Doc. 1] ¶ 7, Ex. A (the "Charter Agreement.")) Under the Charter Agreement, Kelly agreed to pay $110,000 (plus tax and an "Advance Provisioning Allowance" of $30,000) to General Marine in two installments. (*Charter Agreement* p. 1.) The first installment for $55,000 was due on February 5, 2020, and the second installment for $92,400 was due on February 27, 2020. (*Id.*) The agreement included an Arbitration & Law provision, stating that disagreements or disputes were to be resolved by arbitration through the London Maritime Arbitrators Association in London, United Kingdom, under the U.K. Arbitration Act of 1996. (*Id.* cl. 23.)

Kelly paid the first installment late on February 19, 2020. (*Compl.* Ex. B (the "Arbitration Award") ¶ 11.) Kelly did not pay the second installment. (*Id.*) On March 5, 2020, General Marine notified Kelly that as a result of his failure to pay, it was "treating the Charter Agreement as being repudiated by you." (*Id.*) General Marine warned that if Kelly did not pay, it would pursue the sums due under the arbitration provision. (*Id.*)

Kelly claims he was unaware of Covid-19 when he entered into the Charter Agreement on February 7, 2020, and that by late February 2020, he was concerned that he would be prevented from traveling internationally due to Covid-19 restrictions, and that it would be unsafe for his family to travel to the Bahamas. (*Opp'n* [Doc. 8] at 3.) Therefore, in "mid-March 2020" (after the second installment was due), Kelly requested that General Marine postpone the charter to an agreed-upon time in the future when it was safer to travel, but General Marine refused. (*Id.*) On March 22, 2020, General Marine notified Kelly that it had been discharged from all contractual obligations, would retain the full amount of the first installment, and would seek to recover the second installment from him. (*Arbitration Award* ¶ 13.)

1  General Marine submitted the dispute to arbitration. Under the agreement, each
2  party selected an arbitrator. (*Compl*. ¶¶ 8, 9.) At the arbitration, each party was
3  represented by legal counsel, and each alleged the other breached the Charter Agreement.
4  (*Id.* ¶ 10.)

5  On March 22, 2021, the arbitration panel awarded General Marine $55,000.00 in
6  damages, £24,301.96 in attorney fees, and £11,600.00 in arbitration costs, with 4.5%
7  interest per annum compounded at three-month intervals. (*Compl.* ¶ 11; *Arbitration*
8  *Award*.) As a result, Kelly owes General Marine $109,753.73 as of November 1, 2021,
9  when General Marine filed the pending motion. (*Mot.* at 4.) There is no dispute the
10 award is final, and has not been vacated, stayed, or set aside. (*Id.*) Kelly had the
11 opportunity to challenge the award in the English court system, but has not done so. (*Id.*
12 at 2.) He has also not paid the Arbitration Award to General Marine. (*Compl.* ¶ 13.)

13 On August 9, 2021, General Marine filed this lawsuit to confirm the Arbitration
14 Award. On September 28, 2021, Kelly answered the Complaint and asserted six
15 affirmative defenses. (*Answer* [Doc. 5].) General Marine now moves to confirm the
16 award. (*See Mot.*) It also requests that the award be converted to U.S. dollars and
17 judgment entered against Kelly. (*Id.* at 2.) Kelly counters that the award should not be
18 enforced because it violates public policy and because Kelly was under incapacity to
19 perform his contractual obligations. (*Opp'n* at 5–6.) Kelly also argues the award cannot
20 be enforced because the Complaint only includes a copy of the Charter Agreement and
21 Arbitration Award, rather than the original documents or duly certified copies of the
22 documents. (*Id.* at 6.)

## II.  LEGAL STANDARD

The Federal Arbitration Act ("FAA") reflects a strong federal policy favoring arbitration. A.G. Edwards & Sons, Inc. v. McCollough, 967 F.2d 1401, 1404 n.2 (9th Cir. 1992). Arbitration agreements "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2.

When parties agree to resolve their dispute through arbitration, courts generally defer to the arbitration panel's decisions. See Todd Shipyards Corp. v. Cunard Lines, 943 F.2d 1056, 1060 (9th Cir. 1991) ("It is generally held that an arbitration award will not be set aside unless it evidences a 'manifest disregard for the law.'"); Catz Am. Co. v. Pearl Grange Fruit Exch., Inc., 292 F.Supp. 549, 551(S.D.N.Y. 1968) ("Since one of the fundamental purposes of resorting to arbitration is to reduce the cost and delay of litigation, the role of the court must be limited in reviewing an arbitration award.").

The United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards ("Convention") requires courts of contracting states to give effect to private arbitration agreements and to enforce arbitration awards in other contracting states. The Convention is enforced in the United States through 9 U.S.C. § 201 *et seq*.

The Convention applies if the relationship involves "property located abroad, envisage[] performance or enforcement abroad, or [have] some other reasonable relation with one or more foreign states." 9 U.S.C. § 202. Congress has given district courts original jurisdiction over actions falling under the Convention. 9 U.S.C. § 203. "Within three years after an arbitral award falling under the Convention is made, any party to the arbitration may apply to any court having jurisdiction under this chapter for an order confirming the award as against any other party to the arbitration." 9 U.S.C. § 207. "The court shall confirm the award unless it finds one of the grounds for refusal or deferral of recognition or enforcement of the award specified in the said Convention." *Id.*

Relevant to this case, the Convention authorizes a court to refuse to recognize a foreign arbitral award where the "recognition or enforcement of the award would be contrary to the public policy of that country," or where the parties to the arbitration agreement were "under some incapacity." Convention, Art. V, ¶¶ 1(a), 2(b). The Convention also states that to obtain enforcement, the party applying for enforcement shall supply the duly authenticated original award or a duly certified copy, as well as the original arbitration agreement. Id., Art. IV, ¶ 1 (a)–(b). A district court's "review of a foreign

arbitration award is quite circumscribed." <u>Ministry of Def. of the Islamic Republic of Iran v. Gould, Inc.</u>, 969 F.2d 764, 770 (9th Cir. 1992).

### III. DISCUSSION

There is no dispute the Convention controls resolution of this action because the United States and the United Kingdom are signatories to the Convention, and the Convention is enforced under federal law.  <u>See</u> 9 U.S.C. § 201; <u>Glencore Grain Rotterdam B.V. v. Shivnath Rai Harnarain Co.</u>, 284 F.3d 1114, 1120 n.3 (9th Cir. 2002) (noting that both the United States and the United Kingdom are signatories to the Convention). Additionally, the subject matter falls under the Convention because the Charter Agreement involved "property located abroad" and "envisaged performance or enforcement abroad." 9 U.S.C. § 207.  The *M/V Alessandra* luxury yacht was located in the Bahamas, Kelly contracted to charter the yacht for eight days in the Bahamas, and both parties agreed to resolve disputes by arbitration in London.  (*Charter Agreement*.)

#### A. The public-policy defense.

Kelly's primary basis for opposing confirmation of the Arbitration Award is the public-policy exception in the Convention.  According to Kelly, confirming the award would violate United States' public policy limiting the spread of Covid-19.  (*Opp'n* at 5:21–6:1.)  In support of this argument, Kelly relies on the following travel restrictions: (1) a March 19, 2020 executive order signed by California Governor Gavin Newsom restricting all non-essential travel; (2) a March 23, 2020 travel advisory from the U.S. Embassy in the Bahamas advising U.S. citizens to return to the United States; and (3) an order by the Bahamas government imposing a 24-hour curfew and closing all ports and airports. (*Id.* at 4:9–23.)  For the following reasons, the Court is not persuaded by Kelly's argument.

The public-policy exception is found in Article V, paragraph 2(b) of the Convention. It provides, in relevant part:

> Recognition and enforcement of an arbitral award may … be refused if the competent authority in the country where recognition and enforcement is sought finds that: … The recognition or enforcement of the award would be contrary to the public policy of that country.

Convention, Art. V, ¶ 2(b).

The Convention's "public policy" defense is narrow. Ministry of Def. & Support v. Cubic Def. Sys., 665 F.3d 1091, 1096–97 (9th Cir. 2011) ("In recognition of a presumption favoring upholding international arbitration awards under the Convention, this [public policy] defense is construed narrowly." (Internal quotations omitted)). It applies "only when confirmation or enforcement of a foreign arbitration award would violate the forum state's most basic notions of morality and justice." Id. (citation omitted). "Although this defense is frequently raised, it has rarely been successful." Id. (citation omitted).

Kelly has failed to cite any case law supporting his argument that the public-policy defense applies. In contrast, General Marine has cited a number of cases that demonstrate the difficulty Kelly faces in relying on this exception.

In National Oil Corp. v. Libyan Sun Oil Co., 733 F.Supp. 800 (D. Del. 1990), an oil company owned by the Libyan Government sought to confirm a foreign arbitration award against a domestic oil company, which failed to perform under an exploration and production sharing agreement. Under the agreement, the domestic company was to carry out and fund oil exploration in Libya. However, after it began exploration, the State Department issued an order prohibiting the use of U.S. passports for travel to Libya, which the domestic company argued prevented its personnel from traveling to Libya to perform under the agreement. In addition to the travel ban, the U.S. Government later banned oil imports from Libya and the U.S. Commerce Department issued export regulations requiring a license for the export of most goods, including technical data and oil technology that the domestic company had planned to export to Libya. Nevertheless, the district court rejected the domestic company's public-policy challenge reasoning, in part:

> The United States has not declared war on Libya, and President Bush has not derecognized the Qadhafi Government. In fact, the current administration has

> specifically given Libya *permission* to bring this action in this Court. Given these facts and actions by our Executive Branch, this Court simply cannot conclude that to confirm a validly obtained, foreign arbitral award in favor of the Libyan Government would violate the United States' "most basic notions of morality and justice."

Id. at 820.

In Ministry of Defense, 665 F.3d 1091, another domestic company, Cubic Defense Systems, Inc., challenged a foreign government's attempt to confirm an international arbitration award. Cubic had entered into an agreement with the Iran's Defense Ministry for the sale and service of an air combat maneuvering range for Iran's military. The parties agreed to discontinue the contract after the Iranian Revolution. Nevertheless, after Cubic sold the equipment to Canada, the Ministry sued Cubic and obtained an arbitration award. In arguing the award should not be confirmed under the public-policy exception, Cubic relied on a number of U.S. regulations that severely restricted trade with Iran. The district court rejected Cubic's challenge. In affirming the district court's ruling, the Ninth Circuit recognized that analysis of the issue "begins with the strong public policy favoring confirmation of foreign arbitration awards." Id. at 1098. The court then held that "although American relations with Iran are heavily regulated, the applicable sanctions regulations do not preclude the confirmation of the ICC Award." Id. (citation and internal quotations omitted).

These cases support General Marine's motion to confirm the Arbitration Award. In both cases, the parties challenging the award clearly demonstrated that U.S. policies would potentially be violated by confirmation of the award. In contrast, Kelly has failed to prove that when the Charter Agreement was repudiated, there was an established U.S. policy to limit the spread of Covid-19. As set forth above, Kelly's argument is based on a U.S. Embassy travel advisory, California's travel restriction and the Bahama's curfew. The latter two do not constitute U.S. policy. At best, they reflect the policies of California and the Bahamas. This is significant because the Convention's public-policy exception applies where "recognition or enforcement of the award would be contrary to the public policy of

*that country.*" Art. V, ¶ 2(b) (emphasis added).  This leaves Kelly's argument hinging entirely on the U.S. Embassy's travel advisory.  Not surprising, he has not cited any case law remotely suggesting that an Embassy's travel advisory is sufficient to establish U.S. policy, particularly one reflecting the most basic notions of morality and justice.  For this reason alone, the Court finds Kelly has failed to satisfy his heavy burden of demonstrating U.S. policy would be violated by confirmation of the Arbitration Award.

Even assuming Kelly established that in early March 2020, U.S. policy sought to limit the spread of Covid-19, he has failed to demonstrate that such a policy reflects the "most basic notions of morality and justice." Ministry of Def., 665 F.3d at 1097.  Again, in Ministry of Defense and National Oil Corp., the arbitration awards were confirmed even though they potentially violated U.S. foreign policies aimed at restricting trade with foreign adversaries.  Given the importance of those policies and the courts' unwillingness to find the arbitration agreements violated those policies, this Court is not persuaded that the alleged policy seeking to limit the spread of Covid-19 falls within the very narrow category of policies reflecting the "most basic notions of morality and justice."  This is particularly true considering the "strong public policy favoring confirmation of foreign arbitration awards" (Ministry of Def. at 1098) and given that Kelly's public policy argument is based on an embassy travel advisory.  For these reasons, the Court finds the public-policy exception does not apply.

### B.     The incapacity defense.

Kelly next argues the Arbitration Award should not be confirmed under Article V, paragraph 1(a).  Under this provision, enforcement of an award may be refused if the party seeking to invoke this exception provides "proof that: The parties to the agreement referred to in article II were, under the law applicable to them, under some incapacity…." Art. V, ¶ 1(a). To prove an incapacity defense, Kelly must draw a "real connection" between the alleged facts and "the fairness of the arbitration proceeding."  Jiangsu Hongtu High Tech Co. v. Apex Digital Inc., 2009 WL 10675959, at *5 (C.D. Cal. Aug. 5, 2009) (upholding

8

the arbitral award even when the defendant claimed it could not present a defense because the president of the defendant company had been detained by Chinese police).

Here, Kelly asserts that he was under incapacity because "he could not have taken the charter without violating laws of the United States, State of California, San Diego County, and the Bahamas." (*Opp'n* at 6:7–9.) The problem with this argument is that Kelly is alleging an inability to perform the Charter Agreement, not that he was under some incapacity that prevented him from having a fair arbitration proceeding. Because the incapacity defense refers to the fairness of the arbitration proceeding, not the merits of the underlying case, Kelly's argument fails.

But even if Article V, ¶ 1(a) was aimed at incapacity in the underlying contract, Kelly has not met the burden for proving this incapacity defense. Under California law, "[a]ll persons are capable of contracting, except minors, persons of unsound mind, and persons deprived of civil rights." Cal. Civ. Code § 1556. Kelly has not presented any evidence demonstrating that he was incapable of contracting with General Marine. Because he was not incapacitated under California law, his argument fails.

Moreover, Kelly did not raise an incapacity argument to the arbitration panel. (*Arbitration Def.'s Brief* [Doc. 9-2.]) [1] Thus, Kelly cannot now raise an incapacity argument regarding the underlying dispute. See Marino v. Writers Guild of Am., E., Inc., 992 F.2d 1480, 1484 (9th Cir. 1993) ("[I]t is well settled that a party may not sit idle through an arbitration procedure and then collaterally attack that procedure on grounds not raised before the arbitrators when the result turns out to be adverse.").

Finally, to the extent Kelly's "incapacity" argument was intended to raise frustration of purpose for entering the contract (i.e., receiving enjoyment of the yacht in the Bahamas), it fails because Kelly raised the argument during arbitration and the panel rejected it. In his arbitration brief, Kelly argued that the Charter Agreement was frustrated by Covid-19.

---

[1] Marked as Exhibit A on [Doc. 9-2].

9

(*Arbitration Def.'s Brief* ¶ 23.)  As support, he presented a "Virus Chronology" and discussed the various shutdowns. (*Id.* at ¶¶ 26–32.)  Nevertheless, the arbitration panel concluded the following:

(a) "[T]he intimations of a worsening pandemic as [of] 27 February were not sufficiently concrete to frustrate the contract as [of] that date";
(b) "as [of] 5 March the contract had not been frustrated"; and
(c) "[s]ince the Charterer had not paid the second instalment which was due and payable [on 5 March], the Owners were therefore entitled to treat the Charterer as having repudiated the Charter."

(*Arbitration Award* ¶¶ 37–39.)  These determinations on frustration of purpose (and incapacity) are within the purview of the arbitral panel. Primerica Life Ins. Co. v. Brown, 304 F.3d 469, 472–73 (5th Cir. 2002) (holding that the arbitrator is to decide a mental capacity defense that does not specifically relate to the arbitration agreement); Union Mutual Stock Life Ins. Co. v. Beneficial Life Ins. Co., 774 F.2d 524, 529 (1st Cir. 1985) (holding that mutual mistake and frustration of purpose in the underlying contract, rather than the arbitration clause itself, are for the arbitrator to decide); Nat'l Fed'n of the Blind v. Container Store, Inc., 904 F.3d 70, 81. n.14 (1st Cir. 2018) ("Broad arbitration agreements have been found to cover challenges to the validity of the entire contract on such grounds as…frustration of purpose…[and] capacity…."). Moreover, other courts have reached the same determination in response to frustration of purpose claims resulting from COVID-19. See, e.g., In re CEC Ent., Inc., 625 B.R. 344, 361–64 (Bankr. S.D. Tex. 2020) (holding that the doctrine of frustration of purpose did not apply to excuse rent payments due during the COVID-19 pandemic.)

Because the arbitration panel considered yet was not persuaded by that argument, Kelly cannot raise a frustration of purpose argument again, thinly veiled as an incapacity argument. "A challenge to the validity of the contract as a whole, and not specifically to the arbitration clause, must go to the arbitrator." Buckeye Check Cashing, Inc. v.

Cardegna, 546 U.S. 440, 448 (2006); see Sommers v. Cuddy, 2009 WL 873983, at *3 (D. Nev. Mar. 30, 2009) (refusing to decide argument that the plaintiff "lacked mental capacity to enter into a contract" because "according to the United States Supreme Court [in Buckeye]" the arbitrator must decide the issue rather than a federal court).

## C. Remaining challenges.

General Marine's Complaint contains copies of the Arbitration Award and the Charter Agreement. Kelly argues that General Marine failed to comply with the Convention because the Complaint does not "include the original arbitration award or a duly certified copy of the original arbitration award" and does not "include the original contract or a duly certified copy of the original contract" containing the arbitration agreement, as required by Article IV of the Convention. (*Opp'n* at 6.)

These technicalities do not prevent the enforcement of the Convention because the copies in the Complaint satisfy the requisite evidentiary standards. Kelly has not raised a genuine issue about the documents' authenticity or the circumstances that make it unfair to admit the duplicate.[2] Thus, the duplicate is admissible to the same extent as the original under Rule 1003 of the Federal Rules of Evidence. Further, these documents have been authenticated by the declarations of Christian Rollins (the Chief Financial Officer of General Marine) and Alistair Feeney (counsel for General Marine in the arbitration proceeding). (*Rollins Decl.* [Doc. 7-1] at ¶¶ 2–4; *Feeney Decl.* [Doc. 7-3] at ¶¶ 2, 11; see also *Rollins Supp. Decl.* [Doc. 9-6] ¶ 2.) Rollins also points out that it would not be possible to include the original Charter Agreement because no "original" exists: the agreement "was executed in counterparts signed by General Marine, Kelly, and their respective brokers." (*Rollins Suppl. Decl.* ¶ 2.; Ex. B [Doc. 9-6].) Because the original document cannot be

---

[2] The Arbitral Award erroneously spells Defendant Kelly's name as "Kelley," but Defendant admits that he is the person who entered into the Charter Agreement and against whom the arbitral award was entered. (*Answer* [Doc. 5.] at ¶¶ 7, 9–12.)

obtained by any available judicial process, an original document also would not be required under Rule 1004 (b) of the Federal Rules of Evidence.

Other courts have arrived at the same conclusion and have characterized arguments like Kelly's as "grasping at straws." See Belize Soc. Dev. Ltd. v. Gov't of Belize, 5 F.Supp.3d 25, 38–39 (D.D.C. 2013); Wong To Yick Wood Lock Ointment Ltd. v. Madison One Acme Inc., No. CV 14-07645 SJO (FFMX), 2015 WL 13919442, at *6 (C.D. Cal. Apr. 21, 2015); Arbitration Between Overseas Cosmos, Inc. v. NR Vessel Corp., No. 97 CIV. 5898 (DC), 1997 WL 757041, at *5 (S.D.N.Y. Dec. 8, 1997). These cases held that "sworn and certified copies of these documents are sufficient to satisfy the requirements of Article IV" of the Convention. Belize, 5 F.Supp.3d at 38–39. In each of these cases, a party was challenging the "enforceability—not the existence or genuineness—of the arbitration agreement or award" based on a "mere technicality." Id. at 38. "The purpose of Article IV's 'original … or duly certified copy' requirement is to require the petitioner to prove that the relevant documents exist." Id. Requiring the original documents would be "unnecessarily restrictive and at odds with a common sense reading of the provision." Bergesen v. Joseph Muller Corp., 710 F.2d 928, 934 (2d Cir.1983).

## II.  CONCLUSION & ORDER

For the foregoing reasons, the Court **GRANTS** General Marine's motion [Doc. 7] and **CONFIRMS** the Arbitration Award.

**IT IS SO ORDERED.**

Dated: May 9, 2022

Hon. Thomas J. Whelan
United States District Judge